Thomas C. Green
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000



07 CV 5946

*Counsel for the Movant*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| C. GREGORY EARLS, | ) | No. 03-cr-0364 (NRB) |
|  | ) |  |
| Movant, | ) | **MOTION TO VACATE, SET ASIDE, OR** |
|  | ) | **CORRECT SENTENCE PURSUANT TO** |
| v. | ) | **28 U.S.C. § 2255** |
|  | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Respondent. | ) |  |

JUN 22 2007

U.S. D.C. S.D. N.Y.
CASHIERS

### BACKGROUND

On March 24, 2003, the government filed a 22-count indictment against the movant, C.

Gregory Earls, charging him with having committed securities, wire, and mail fraud. On April

23, 2004, following a four-week trial before this honorable court, the jury convicted Mr. Earls on

all counts.

In advance of sentencing, the probation office issued a presentence-investigation report

("PSR"), recommending that the court sentence Mr. Earls to serve concurrent prison terms under

a guideline range of 151-188 months.[1] PSR at 31. In light of Mr. Earls having no criminal

---

[1] The probation office prepared the PSR in July 2004, but issued a revised PSR in January 2005.
All references to the PSR are to the revised PSR because that is the version considered by the
court at Mr. Earls's sentencing. *See* Feb. 25, 2005 Tr. at 2:8-9 (relying on "a presentence report
which bears the date of January 7, 2005").

history, the recommendation was largely and expressly based on the PSR's finding that Mr. Earls defrauded over 50 investors out of $21,971,628. PSR at 11, 14. Specifically, the PSR began its sentence calculation with a six-point base offense level, the number prescribed under Section 2B1.1(a)(2) of the sentencing guidelines. PSR at 13. To that number, the PSR added 26 points due to the finding that the loss exceeded $20 million and involved over 50 investors. PSR at 13. The only other enhancement was a two-point adjustment accounting for Mr. Earls's leadership role in the offenses. PSR at 13. Accordingly, the PSR assigned a 34-point total offense level. PSR at 14.

Mr. Earls filed timely objections to both the PSR's calculation of the loss amount and the finding that he had defrauded over 50 investors. He based his objections on *Blakely v. Washington*, 542 U.S. 296 (2004), the predecessor case to *United States v. Booker*, 543 U.S. 220 (2005). PSR at 27. Mr. Earls questioned the prescribed loss amount and the PSR's allegation that he still owed money to *all* of the investors, concluding that both figures were neither supported by the government's trial evidence presented to the jury nor found by the jury. PSR at 27-28.

To each of the foregoing objections, the PSR author responded by noting that she had "consulted with the Government" and was "informed that the information as contained in the presentence report is accurate." PSR at 27-28. As a result, the PSR author did not resolve the factual disputes that formed the basis for the proposed 26-point enhancement to Mr. Earls's base offense level, observing instead that "the[se] issue[s] remain[] unresolved." PSR at 27-29. Nevertheless, the PSR grounded its "SENTENCING RECOMMENDATION" on the government's version of the total number of victims and loss amount without providing an alternate sentencing recommendation should the court have decided to sustain Mr. Earls's

objections. PSR at 31 (capitalization in original). The PSR's table summary indicated that the court should impose restitution in the amount of $21,971,628, PSR at 31, but the entire "**Justification**" for the PSR's recommendation was that "[t]he aggregate sum of loss is $21,971,628. As four of the investors received their money back which totaled $719,130, 93 individuals are owed a total amount of $19,952,498.98."[2] PSR at 32 (bold lettering and underscoring in original). The lower amount is also reflected in the "scripted" portion of the PSR, which recommended that the court issue the following directive at the sentencing: "It is further ordered that the defendant shall make restitution payable to the Clerk, U.S. District Court, for disbursement in the amount of $19,952,498.98." PSR at 34.

At sentencing, on February 25, 2005, defense counsel reiterated Mr. Earls's objections to the loss amount.[3] Feb. 25, 2005 Tr. at 3:16. The following exchange ensued:

GOV'T:    And I would note that Mr. Earls was arrested in December of 2002. The trial was last year in April. He has had more than enough time to put together supporting documentation for these financial claims that he is making about the money and the transfers. And at the end of the day, we get a list of purported advances and SEC filing that, frankly, I had a difficult time finding in the documents themselves.

DEFENSE:    Your Honor, they were taken from the SEC filings and, as I indicated in my reply brief, if the Court will allow - - [*the court interjects*]

---

[2] It is unclear why the PSR's table summary recommends a total loss and restitution in the amount of $21,971,628 in light of the PSR's express justification that the total amount owed by Mr. Earls to investors is the lower sum of $19,952,498.98, a notable difference of over $2 million. Not reconciling the two figures, the court perhaps inadvertently based its sentence on the higher figure mistakenly endorsed in the PSR's table summary. *See* PSR at 31. This lower sum also cannot be correct based on the justifications given in the PSR. The PSR indicated that Mr. Earls paid back $719,130, which would leave $21,252,498 to be repaid. Given the PSR's inaccurate accounting, it is unclear precisely what the PSR author had in mind. In any event, as later discussed, all of these numbers are erroneous.

[3] Mr. Earls also restated his objections in his sentencing memorandum, filed with the court on January 31, 2005. Sentencing Mem. at 17-24; *accord* Reply to Gov't Sentencing Mem. at 9-10; Am. Reply to Gov't Sentencing Mem. at 9-10.

COURT:  *In the end it doesn't matter. That is the bottom line. It really doesn't matter* whether he pocketed 11.2 million or 13.6 million or 9.8 million. *It doesn't factor into any decision that I have to make.* It has always been clear that some of the money that was invested in USV Partners was properly used to purchase US Technologies stock, but some of it wasn't and you have acknowledged that. So I think you should move on to something that actually has practical significance today.

Feb. 25, 2005 Tr. at 14:15-15:9 (emphasis added). In his comments to the court, Mr. Earls also objected to the loss amount alleged by the government, and noted that the government had not shared its proof of restitution until the day of the sentencing:

EARLS:  But the way the government has characterized [the loss amount], it is certainly not the case, if you look at the audited records. . . . The reason that the government doesn't realize that, and *I just saw it today because we just got their exhibits today, and I just saw them two or three hours ago*, and I don't think that they did it intentionally, I really don't. . . . I have noticed, for one thing, there was a 3-million wire that was missing. I just remembered it because it was such a large amount. And I remember another 600,000 that I didn't see on there. . . .

Feb. 25, 2005 Tr. at 26:14-27:5.

  The court sentenced Mr. Earls to serve a prison term of 125 months, which was a shorter term than that recommended in the PSR. Judgment filed Mar. 2, 2005 at 1-9. The court also imposed restitution in the amount of $21,971,628, the higher figure contained in the PSR's table summary. *Id.* It is also apparent that the court adopted the findings in the PSR, offering the following justification for the sentence:

COURT:  I turn now to the process that I have engaged in to arrive at the sentence for Mr. Earls. First, I have considered the sentence that would be called for by a traditional guidelines calculation. *There is ample support in the record for an offense level of 34*, resulting in a guidelines range of 151 to 188 months. *Mr. Earls defrauded over $20 million from over nine years.* Next, I have considered the factors listed in 18[] U.S.C.[ Section] 3553(a). Having considered all of the applicable factors, I have concluded that a sentence of 125 months provides just punishment and considers the positive aspects of defendant's life and his age but maintains the need for general deterrence, specific deterrence and a respect for law. Further, Mr. Earls is placed on supervised release for three years. No fine is imposed. The special assessment is $2,200, and restitution in the amount of $21,971,628. . . .

Feb. 25, 2005 Tr. at 38:20-39:13 (emphasis added). The sentencing transcript reflects that the

court, in imposing sentence and providing its supportive rationale, did not resolve Mr. Earls's

objections to the PSR's claimed loss amount and number of victims. Feb. 25, 2005 Tr. at 34:4-

39:16.

In a letter dated April 19, 2005, Mr. Earls asked the court to reconsider the imposed

sentence, noting discrepancies in the government's proposed loss amount that had been adopted

by the PSR and the court, but not presented at trial. Mr. Earls did not receive any response to his

letter.

## DISCUSSION

I.    **The Sentencing Court Adopted the PSR's Reported Amount of Loss and Number of Victims Resulting in an Unreasonable Prison Sentence Even Though Neither Fact Was Established at Trial and the Court Failed to Resolve Material Objections**

The sentence imposed on Mr. Earls is unconstitutional and is otherwise open to collateral

attack because it has resulted in a fundamental miscarriage of justice. The Sixth Amendment of

the United States Constitution provides that in all criminal prosecutions, "the accused shall enjoy

the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. When a

jury does not make findings as to the loss amount and number of victims affected by the criminal

conduct, but the sentencing court relies on such findings to exponentially increase a defendant's

prison sentence, it cannot be said that the jury has authorized the resulting sentence in any

meaningful sense. That is precisely what happened here.

Mr. Earls continues to assert that the amount of loss and number of victims expressed in

the PSR and adopted by the court at his sentencing are too high and result in an unreasonable

prison sentence. Because the government did not conclusively establish at trial (nor at the

sentencing hearing) the number of victims and loss amount, the corresponding enhancements to

Mr. Earls's base offense level conflict with the spirit of *United States v. Booker*, 543 U.S. 220

(2005), requiring that the jury's verdict alone must authorize a defendant's sentence.[4]  *Id.* at 235;

*accord Blakely v. Washington*, 542 U.S. 296, 305 (2004) ("ensuring that the judge's authority to

sentence derives *wholly* from the jury's verdict" (emphasis added)).  At a minimum, Mr. Earls

respectfully requests a recalculation of his sentencing range based on a corrected loss amount

reached after a full consideration of the *unresolved* objections that he raised at his sentencing

hearing.  A full reconsideration would also correct the PSR's erroneous restitution calculations.

*See supra*, footnote 2.

      Notwithstanding the fact that Mr. Earls was effectively denied an opportunity to rebut the

government's purported evidence of restitution presented at his sentencing hearing, the

sentencing court's adoption of the PSR's findings relative to the loss amount and number of

victims seriously diminishes the jury's role and dramatically undermines the protections

enshrined in the Sixth Amendment.  Both *Booker* and the clear import of the Sixth Amendment

prohibit such a result.

---

[4]  Mr. Earls also objects to the Second Circuit's holding that the Sixth Amendment does not apply to orders of restitution.  *United States v. Reifler*, 446 F.3d 65, 118 (2d Cir. 2006) ("[T]he *Booker-Blakely* principle that jury findings, or admissions by the defendant, establish the 'maximum' authorized punishment has no application to [Mandatory Victims Restitution Act] orders of restitution.").  While Mr. Earls understands that, for at least the time being, the rule is settled in this circuit, he seeks to expressly preserve his position in the event that the rule is later overturned.  Mr. Earls notes that various circuit courts have wrestled with the question as it applies to orders of restitution under the Mandatory Victims Restitution Act of 1996.  The question has not been addressed by the Supreme Court and, as recently highlighted by the Third Circuit's splintered 7-5 en banc decision in *United States v. Leahy*, 438 F.3d 328 (3d Cir. 2006), there is considerable room for questioning the rule's continuing vitality.  *See id.* at 339 (McKee, J., dissenting in part) ("I do not agree that a judge can determine the amount of restitution under [ ] the Mandatory Victims Restitution Act . . . without violating the Sixth Amendment.").  That said, Mr. Earls will focus his arguments on the applicable sentencing enhancements that were grounded in judicial findings of loss amount and number of affected victims.

Animating *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny is a palpable

concern for the erosion of the right to a jury trial fueled by changes in the sentencing system.

*See Harris v. United States*, 536 U.S. 545, 557-66 (2002) (plurality opinion) ("*Apprendi* said that

any fact extending the defendant's sentence beyond the maximum authorized by the jury's

verdict would have been considered an element of an aggravated crime—and thus the domain of

the jury—by those who framed the Bill of Rights."). Over the last few decades, new

developments have threatened the jury's historical province, diminishing the role of the jury and

ceding it to the trial judge. *Booker*, 543 U.S. at 236-37. Increased legislative regulation of

sentencing created a new sentencing regime in which Congress selected certain facts that, if

found by the judge, would result in heavier sentences or increased sentencing ranges. *Id.* at 236.

The judge, not the jury, often found these facts as part of the sentencing process, thus gradually

lessening the importance of the jury verdict as the predicate for the sentence. *Id.*; *see also Jones*

*v. United States*, 526 U.S. 227, 244 (1999) (observing that judge-made sentencing enhancements

reduce the jury's decision "to the relevant importance of low-level gatekeeping").[5]

Troubled by this development, the Supreme Court moved to "preserve Sixth Amendment

substance," *Booker*, 543 U.S. at 237, by prohibiting the imposition of any sentence based on the

judge's finding of an essential fact other than a prior conviction, or, put another way, any

sentence not authorized by the jury's verdict. *Id.* at 235; *accord Blakely*, 542 U.S. at 303

(characterizing the rule as a "bright line rule"). Recently, the Court examined a "four-year

[sentencing] elevation based on judicial factfinding" and reaffirmed that "the jury's verdict alone

limit[s] the permissible sentence" and that "[a]dditional factfinding by the trial judge[ that]

---

[5] As *Jones* recognized, "[i]f a potential penalty might rise from 15 years to life on a nonjury determination, . . . a jury finding of fact necessary for a maximum 15-year sentence would merely open the door to a judicial finding sufficient for life imprisonment." 526 U.S. at 243-44.

yield[s] an upper term" constitutes a denial of the defendant's right to a jury trial. *Cunningham v. California*, 127 S. Ct. 856, 865 (2007). It is in this context that the court must decide whether the jury has authorized a 10+ year sentence for Mr. Earls, a first-time offender who would have otherwise qualified for a much lower sentence.

It stands to reason that the Sixth Amendment is violated where a judge determines the amount of loss and number of victims enhancing a prison sentence. The rule of *Apprendi* applies to criminal penalties that increase a defendant's sentence "beyond the prescribed statutory maximum." *Apprendi*, 530 U.S. at 490. *Blakely* clarified that the "statutory maximum" for Sixth Amendment purposes is not the maximum sentence prescribed for a given offense; rather, "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303 (emphasis in original). The Court clarified further by explaining: "In other words, the relevant 'statutory maximum' [for Sixth Amendment purposes] is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* (emphasis in original). That definition of "statutory maximum" fatally undermines the sentence imposed in Mr. Earls's case because the sentencing judge handed down a prison sentence greater than that authorized by the jury's verdict alone merely by finding additional facts.[6]

---

[6] Had the court been inclined to permit a showing at the sentencing hearing of the appropriate amount of loss and the number of affected victims, the loss figure would have approximated $6 million and the victims figure would have been less than 10. The sentencing court, however, did not care to hear Mr. Earls's evidence. The point here is that the government did not quantify the amount of loss or the number of victims. Thus, in theory, if *Booker* has any meaningful application at all, even under an advisory guidelines system, Mr. Earls would have qualified for a 0-6 month prison term or a possible term of probation under the applicable 2002 sentencing guidelines. This is because both factors (loss and victims) accounted for 26 of the 34-point total offense level. PSR at 13-14. Subtracting 26 from 34 yields a total offense level of 8, and 8

*(Footnote continued)*

While it is true that the Second Circuit has held that judicial fact-finding in connection with a *restitution order* does not raise Sixth Amendment concerns, *United States v. Boccagna*, 450 F.3d 107, 108-09 (2d Cir. 2006); *United States v. Reifler*, 446 F.3d 65, 118 (2d Cir. 2006), it is beside the point.[7] Not only are restitution orders wholly distinct from a prison sentence—the former being merely a cash transfer and the latter an important restriction on liberty which implicates directly the Sixth Amendment concerns animating *Apprendi*—Mr. Earls is not challenging the restitution order here. This court's inquiry should begin and end with *Apprendi*'s bright-line concept of "statutory maximum" and the Supreme Court's definition of that term. It then bears repeating that "the 'statutory maximum' . . . is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. It is indeed difficult to avoid the logical consequence of the rule." *Blakely*, 542 U.S. at 303 (emphasis in original).

---

points for a first-time offender (criminal history category I) places Mr. Earls in the lowest prison-term category under the guidelines. *See* U.S.S.G. Sentencing Table (2002).

[7] But the constitutional concerns, at least from the perspective of the Supreme Court, are evident. To accept the government's position is to accept two artificial propositions: (1) that an order of restitution rests upon the jury's verdict *alone*, even though Mr. Earls's restitution was not imposed until the judge determined the amount of loss, and (2) that adding a set dollar amount of restitution to a sentence does not enhance the sentence beyond that authorized by the jury verdict alone. With respect to the latter, any defendant sentenced to a period of imprisonment and ordered to pay restitution in an amount exceeding $20 million would be surprised to learn that his sentence has not been enhanced by the additional penalty of restitution. Although a majority of the federal appeals courts to consider the issue have joined the Second Circuit in holding that *Booker* does not apply to orders of restitution, an equally impressive list of courts incorrectly concluded before *Booker* that *Apprendi* does not apply to the federal sentencing guidelines. *E.g.*, *United States v. Luciano*, 311 F.3d 146, 153 (2d Cir. 2002). Regardless, Mr. Earls is not challenging his restitution here.

To regard the additional facts in the PSR required to impose the prison sentence as not

the same "additional facts" in *Blakely* avoids the logical consequence of the rule.  The Supreme

Court has rejected such a distinction:

> Whether the judge's authority to impose an enhanced sentence depends
> on finding a specified fact [e.g., the amount of loss] . . . one of several
> specified facts . . . or any aggravating fact . . . , it remains the case that
> the jury's verdict alone does not authorize the sentence.

*Id.* at 305.  Thus, any claim that the conviction implicitly authorizes findings of the loss amount

and number of affected victims, and that the judicial determination of loss merely quantifies the

restitution penalty arising from the conviction, should be rejected as technical hairsplitting that is

analogous to the "constitutionally novel and elusive distinction between 'elements' and

'sentencing factors.'"[8]  *Apprendi*, 530 U.S. at 494.  The fact remains that had it not been for the

challenged judicial findings, Mr. Earls would have been eligible for a much shorter sentence

under the applicable sentencing guidelines.[9]

---

[8]  Another point that merits attention is that the precise issue of the Sixth Amendment's
application to restitution-associated enhancements was not before the Court in *Apprendi* or its
progeny.  It is therefore quite probable that the Court never considered the issue when it crafted
those landmark opinions.  Nevertheless, given the Court's recent jurisprudence, lower courts
may not be at liberty to place certain sentencing enhancements in a separate category beyond the
reach of the Sixth Amendment's jury requirement.  Given the clear pronouncements in *Apprendi*,
*Blakely*, and *Booker*, any such distinction must be drawn by the Supreme Court in the first
instance.

[9]  Moreover, the judicial determination of loss in this case was premised on an incorrect
understanding of the record.  For example, the sentencing court, in providing its rationale in
support of Mr. Earls's imposed sentence, was under the misimpression that "[t]here is ample
support in the record for an offense level of 34" because "Mr. Earls defrauded over $20 million
*from over nine years*."  Feb. 25, 2005 Tr. at 38:24, 39:1 (emphasis added).  There is absolutely
no basis for suggesting that the charged fraud occurred over a nine-year period.  Indeed, the
government has always taken the position that the charged fraud occurred over a four-year period
(i.e., 1998, 1999, 2000, and 2001).  The fact that the sentencing court expressly found that the
purported fraud occurred over a nine-year period suggests that the court considered conduct that
has neither been alleged nor proven.  This error is a perfect illustration of the *Booker* principles
*(Footnote continued)*

In *Blakely*, "[t]he application of Washington's sentencing scheme violated the defendant's right to have the jury find the existence of any particular fact that the law makes essential to his punishment." *Booker*, 543 U.S. at 232 (discussing *Blakely*) (internal quotation marks omitted). Similarly, the sentencing court in Mr. Earls's case made no finding whatsoever as to the additional facts of the loss amount and number of victims in order to augment his prison term upwards to 125 months.[10]

## II.    Evidence the Sentencing Court Refused to Hear Undermines the Sentencing Process and the Sentence Imposed

Notwithstanding the sentencing court's reliance on information that was not tested by trial or found by the jury, the information itself is evidently flawed. The record shows that the court miscalculated the number of victims and loss amount attributable to Mr. Earls. The government's own evidence, presented at sentencing, conflicts with the court's findings necessitating the enhancements to Mr. Earls's base offense level. A summary review of the record reveals that the government's mathematical calculations of the amount misappropriated by Mr. Earls and the number of affected victims are unreliable and patently incorrect. The sentencing court should have allowed Mr. Earls the opportunity to present rebuttal evidence to show the mathematical errors made by the government. Had the government shared its evidence

---

and the need to meaningfully guard against the consideration of additional facts in the PSR to impose a prison sentence.

[10]  Moreover, Mr. Earls' sentence may also contradict longstanding Fifth Amendment due process principles by ignoring the risk of erroneously setting the sentencing range too high based upon consideration of uncharged conduct during the sentencing process. That risk is reduced to constitutionally acceptable levels when a sentencing range is established by factoring in crimes for which a defendant has been convicted, such as the defendant's criminal history. The convictions comprising that history have been established by proof beyond a reasonable doubt, and the defendant has been afforded the full panoply of constitutional rights that comprise the bulwark that safeguards him from the power of the state. Considering crimes that rest only upon a preponderance of the evidence is obviously different from the situation here.

prior to the day of sentencing and had the court allowed Mr. Earls an opportunity to call the independent auditors to testify at sentencing, it is very likely that the court would have rejected the government's arithmetic and imposed a lower sentence.

At the sentencing hearing, Mr. Earls saw the government's four schedules (years 1998, 1999, 2000, and 2001) for the first time. Feb. 25, 2005 Tr. at 26:14-27:5 ("I just saw [the government's schedules] today because we just got their exhibits today, and I just saw them two or three hours ago . . . ."). Those schedules are summarized in Mr. Earls's appellate brief as follows:

| Year | Gov't Exhibits | SEC Statements Audited |
|---|---|---|
| 1998 | $ 350,000 | $ 3,700,000 |
| 1999 | $ 2,784,000 | $ 7,415,703 |
| 2000 | $ 6,082,983 | $ 12,025,200 |
| 2001 (cumulative total) | **$ 7,926,783** | **$14,386,110** |

Appellant's Opening Br. at 33; Radin Aff. Ex. B.[11] The government submitted these schedules, utilizing cumulative amounts from year to year, in an effort to show the amount of money that Mr. Earls legitimately delivered to U.S. Technologies for the purchase of stock.[12] Mr. Earls

---

[11] The Clerk's Office and the government have not been able to find a copy of the sentencing schedules introduced for the first time at the sentencing hearing. The best evidence of the schedules is the summary table contained in Mr. Earls's opening brief on direct appeal. The government has confirmed that it will not challenge the summary of the schedules as reflected in the opening appellate brief and provided herein. The SEC figures in the third column, also appearing in the opening brief, are derived from government exhibits.

[12] As the independent auditor explains in his affidavit, the government's schedules "appear[] to have used cumulative amounts which, by their nature, are difficult to follow and require further analysis to evaluate. When such information is presented, I, as an experienced auditor, get an immediate reaction that there may be an error necessitating further investigation." Radin Aff. at 4.

immediately perceived a large accounting error: although the government's 1998 schedule reported that Mr. Earls disbursed only $350,000 to U.S. Technologies, he remembered that he had personally facilitated the wiring of approximately $3 million to U.S. Technologies in a single transaction in 1998. When Mr. Earls addressed the court, he specifically pointed out the error: "I have noticed, for one thing, there was a 3-million wire that was missing. I just remembered it because it was such a large amount." Feb. 25, 2005 Tr. at 27:2-4. The court never resolved Mr. Earls's claim that the 1998 schedule was vastly understated. This discrepancy alone signals a fundamental miscarriage of justice and requires a reevaluation of the imposed sentence.

There is more evidence casting grave doubt on the figures provided by the government and relied on by the court at sentencing. According to the government and the PSR, between 1998 and 2002, Mr. Earls misappropriated two-thirds, or $13.8 million of the $20 million that he solicited from investors wanting to purchase U.S. Technologies stock. Gov't Sentencing Mem. at 6. The court based its calculations on the government's schedules, which accounted for only $7,926,783 as making its way from Mr. Earls's company, USV Partners, to U.S. Technologies for the purchase of stock. After the sentencing hearing, Mr. Earls undertook a thorough review of the government's schedules and compared them to the two separate audits of U.S. Technologies performed by two independent auditors. There was a striking difference between the government's numbers and the auditors' numbers, providing hard evidence that the numbers in the government's schedules were vastly understated.[13]

The audits for 1998 demonstrate that Mr. Earls's company purchased $3.7 million of U.S. Technologies stock, which means that the government was off the mark by $3.35 million for that year. This figure closely matches the missing $3 million deposit that Mr. Earls was able to

---

[13]  Both independent audits were based on government, SEC filings. Accordingly, it would be difficult for the government to claim that such documentation is unreliable.

immediately remember and raise at the sentencing hearing. Feb. 25, 2005 Tr. at 27:2-4. For 1999, the government's schedule showed that the running total for disbursements to U.S. Technologies was $2,784,000, whereas each independent audit showed those disbursements as totaling $7,415,703, a difference of over $4.6 million. The audits also reported sums greater than the government's schedules for the remaining years of 2000 and 2001. When comparing the bottom line of the government's schedules—reporting $7,926,783 as being disbursed for U.S. Technologies stock—with the bottom line of the audited SEC statements—reporting $14,386,110 as being disbursed for U.S. Technologies stock—it is obvious that the government's reported figures comprised a material mathematical innacuracy. The government claimed that Mr. Earls disbursed less than $8 million to U.S. Technologies and misappropriated $13.8 million when the audits proved that he actually purchased $14,386,110 of U.S. Technologies stock for his investors.[14] This means that the actual and intended loss figures could not possibly exceed approximately $6 million, compelling reexamination of the sentencing court's finding that Mr. Earls misappropriated two-thirds of the investors' money.

If the court would have allowed Mr. Earls a meaningful opportunity to present his arguments at sentencing, the flaws in the PSR would have been exposed and the court would have been more cautious in adopting the suspect and unestablished figures. Mr. Earls would have also called one of the independent auditors, Arthur Radin, C.P.A., to testify at the sentencing hearing. Drawing from his personal knowledge of the audits and his expertise as an

---

[14] Mr. Earls's company, USV Partners LLP, raised approximately $20 million to purchase shares of U.S. Technologies and, as specified by the audits of U.S. Technologies and Mr. Radin's affidavit, approximately $14.3 million was delivered to U.S. Technologies by Mr. Earls's company. Radin Aff. at 2-3. The balance of approximately $6 million was used to purchase shares of U.S. Technologies from third parties, such as Texas Pacific Group ($1.1 million) and Kenneth Smith ($2.1 million). Because these third-party purchases were not sales by U.S. Technologies, they were never audited, but they were listed in the SEC's 10-K and 10-Q filings.

accountant and auditor for 45 years, Mr. Radin "would have undoubtedly demonstrated the

obvious inconsistencies and . . . inaccuracies in the amounts provided by the government's

schedules and loss claim." Radin Aff. at 2. Mr. Radin would have also concluded that "the

government claimed excessive losses by *at least* $6 million." *Id.* (emphasis added). In the

contemporaneously submitted affidavit, Mr. Radin explains that "the government's claim and the

financial statements are inconsistent." *Id.* Mr. Radin further explains that "the loss figures

reached by the sentencing court miscalculated the loss amount attributable to Mr. Earls as they

relate to investments in [U.S. Technologies]." *Id.* at 3. In addition, Mr. Radin notes:

> It troubles me that the sentencing court relied on the
> government's calculations, which I have already described as
> inaccurate and unreliable. Had I been given the opportunity
> to testify at Mr. Earls' sentencing hearing, I would have
> presented testimony that would have demonstrated the
> differences between the schedules presented by the
> government and the amounts reported in the financial
> statements.

*Id.*

Mr. Earls proceeded to write a letter to the sentencing judge, asking the court to

reconsider the government's evidence in light of Mr. Earls's objections, yet, no response was

received. Although the defense had filed objections to the PSR and noted those objections in its

brief prior to sentencing, those objections remain unresolved by the court. *See United States v.*

*Mejia-Pimental*, 477 F.3d 1100, 1102 (9th Cir. 2007) ("On appeal, we reversed and remanded

for resentencing because the district court had failed to resolve 'significant . . . objections' to the

PSR."). The judge neither allowed defense counsel to proceed in making its arguments or Mr.

Earls to explain the reasons for why the court should have doubted the government's figures.

Mr. Earls simply seeks an opportunity to prove that the government's claims of misappropriated

funds are in error and call the independent auditors to rebut the government's proffered

schedules and verify his analysis, an opportunity the court refused to provide at his sentencing.

As the following exchange between Mr. Earls's counsel and the court shows, the court was

unwilling to hear Mr. Earls's attempts to present evidence and argument in his favor:

DEFENSE:    Your Honor, they were taken from the SEC filings and, as I indicated in my reply brief, if the Court will allow - - [*the court interjects*]

COURT:    In the end it doesn't matter. That is the bottom line. *It really doesn't matter whether he pocketed 11.2 million or 13.6 million or 9.8 million. It doesn't factor into any decision that I have to make.* It has always been clear that some of the money that was invested in USV Partners was properly used to purchase US Technologies stock, but some of it wasn't and you have acknowledged that. So I think you should move on to something that actually has practical significance today.

Tr. at 14:23-15:9 (emphasis added). But how much Mr. Earls allegedly misappropriated clearly

*did* matter and had the greatest impact on his prison sentence. Were it not for the incorrectly

calculated loss amount and number of affected victims, Mr. Earls would have been eligible for a

much shorter prison sentence. *See Solem v. Helm*, 463 U.S. 277, 290 (1983) (recognizing that

"[a] single day in prison may be unconstitutional in some circumstances") (citing *Robinson v.*

*California*, 370 U.S. 660, 667 (1962)).

## CONCLUSION

Although a criminal conviction certainly reduces a defendant's constitutional rights, it

does not jettison all of the protections embodied in the Constitution. The court's unwillingness

to consider Mr. Earls's arguments and evidence in response to the government's purported loss

and victims figures, not to mention the fact that his significant objections to the PSR remain

unresolved to this day, have resulted in a miscarriage of justice. Mr. Earls respectfully requests

that the court reconsider its sentence in this case.

Respectfully submitted,

Dated: June 18, 2007

SIDLEY AUSTIN LLP

By: _____
Thomas C. Green
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

*Counsel for the Movant, C. Gregory Earls*

Admission *pro hac vice* anticipated

By: _____
Steven M. Bierman
787 Seventh Avenue
New York, NY  10019
(212) 839-8582

*Counsel for the Movant, C. Gregory Earls*

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 21, 2007, one copy of the foregoing

"MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28

U.S.C. § 2255" was mailed, first-class postage prepaid, to:

> AUSA William Stellmach
> United States Attorney's Office for
>     the Southern District of New York
> One St. Andrew's Plaza
> New York, NY  10017

> *Counsel for the Government, Case No. 03-cr-0364*

_____

Matthew S. Ferguson